# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

MARGARET TORRES ARREDONDO,

        Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

Case No. 1:13-CV-00300-SMS

ORDER AFFIRMING AGENCY'S
DENIAL OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

Plaintiff Margaret Torres Arredondo, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge. Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence.

I.    **Procedural History**

On December 15, 2009, Plaintiff applied for disability insurance benefits.  On December 31, 2009, she filed an application for supplemental security income.  In both applications, Plaintiff alleged disability beginning April 1, 2008.   The Commissioner initially denied the claims on June

///

1

16, 2010, and upon reconsideration, on December 29, 2010.  On January 24, 2011, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on September 22, 2011.  At the hearing, she amended the onset date of her disability to October 27, 2008, since she had no medical evidence before that date.  Michael Gurvey, an impartial medical expert, and Kenneth Ferra, an impartial vocational expert also appeared and testified.

On December 9, 2011, Administrative Law Judge James E. Ross denied Plaintiff's application.  The Appeals Council denied review on January 7, 2013.  On March 1, 2013, Plaintiff filed a complaint seeking this Court's review.

## II.   **Administrative Record**

**Plaintiff's testimony (September 22, 2011).**  Plaintiff (born February 28, 1957) lived with her husband, adult daughter and two grandchildren, aged 13 and 17.  She had completed a GED.  Her most recent work experience was babysitting, for which she had received no formal training.

Plaintiff testified that, because of her back and arms, she had not driven a car since November 1, 2009.  If she wore her braces, she could hold on to the steering wheel for about 20 to 30 minutes.  She had also stopped cooking because she could not hold a small saucepan or chop vegetables.  She relied on her daughter to cook for her.  Because of her lower back, Plaintiff could sit only 20 to 30 minutes.  She could not use a computer.  Plaintiff did not attend church or community events or her grandchildren's school functions, but testified that she had never done such things.  She was five feet tall and weighed 170 pounds.

Plaintiff goes to the store about once a week.  The other people in the store make her sweaty, clammy, and "like anxious."

Plaintiff's work history was spotty.  She could not recall why she had not worked from 1997-1999 or why she had no earnings in 2001.  From 2002-2006, she was self-employed, babysitting three children of relatives until they no longer needed care.  Thereafter, she cared for her bedridden mother until she died on February 6, 2007.  Plaintiff started "going to the doctor" in 2009.  AR 115.

///

///

2

Because Plaintiff was anxious and having suicidal thoughts in 2009, Dr. Matuk prescribed an anti-depressant. Plaintiff never saw a psychologist or psychiatrist. As a result of taking the antidepressant, Plaintiff began sleeping less.

Plaintiff's medications made her nauseous. Wellbutrin, a new prescription that she had taken only four days by the time of the hearing, made her "feel a little boggly," clouded her head, and made her itchy and anxious. She had recently switched from Vicodin to Norco because Vicodin made her nauseous. Norco and Tramadol made her dizzy and nauseous. Because her pills made her sleepy, Plaintiff could not concentrate or pay attention. When Plaintiff told her physician, Dr. Matuk, that the medications made her sleepy, Dr. Matuk simply told Plaintiff to be careful with machinery and when driving. Plaintiff complained that she could not take many anti-inflammatory medications because of her stomach ulcer.

Beginning in 2009, Plaintiff began dropping things because she could not feel things with her hands. Since that time, her hands had gotten worse since Plaintiff had "neck pain and the pain goes from my neck to my shoulder, down to my hand." AR 115. Plaintiff can lift a half gallon of milk but not a gallon.

**Adult Function Reports.** According to her Adult Function Report, dated January 22, 2010, Plaintiff spent her days eating, resting, and watching television. When she was able, she drove her adult daughter to work. Plaintiff complained of neck and shoulder pain and difficulty grasping things. She frequently awoke during the night with tingling and numbness in her hands and sharp pains in her neck.

Plaintiff did not like to be out among people. When she couldn't have a cigarette or a drink, she became anxious and mad.

Although she needed help with cutting and mixing, Plaintiff prepared meals daily. She loaded laundry, swept, mopped, and did other cleaning. She liked to sew and did the mending.

Plaintiff went out four or five times weekly. She drove herself in a car. Plaintiff shopped two to three times a week for an hour or two. She was able to handle all aspects of her finances. She could walk two hours before needing ten or fifteen minutes rest. She followed written instructions well, spoken instructions "OK," and finished what she started.

**Third Party Adult Function Report.**  Plaintiff's daughter, Pauline Arredondo, reported that her mother could no longer work, rake leaves, vacuum, or comb hair.  She took a long time dressing, and had difficulty shampooing and styling her hair.  Plaintiff cooked dinner daily.  She could mop, sweep, wipe down tables, and clean the bathroom.

Pauline Arredondo reported that Plaintiff argued with everyone about simple things, always yelling and cursing.  Plaintiff did not like change or stress.  At times of stress, Plaintiff yelled and blamed others.

**Disability Appeal Report.**  In her July 2, 2010 report, Plaintiff stated that, since June 17, 2010, her back condition had worsened, with pain going into her hip and down her leg.  Her doctor suspected a ruptured disc. Her neck and shoulder pain was so severe that she had headaches and dizzy spells.  Unable to move around or do anything, she spent most of her time in bed.  Plaintiff arose only to shower and to eat the dinners that her husband prepared.

In a report dated January 28, 2011, Plaintiff complained of pain in her neck, right shoulder, and back, worsened by the winter cold.  Her hands were painful, numb, and weak.  She was depressed and needed help.  She last saw Dr. Matuk in September 2010.  Plaintiff was not taking her prescribed antidepressant because she could not afford it.

**Medical evidence.**  Plaintiff first saw Aileen Matuk, M.D., on October 27, 2009.  The record also includes examination notes for visits on November 17 and 18, and December 15 and 21, 2009; February 4, March 2, 14, and 17, May 24, June 29, July 27, and August 3, 2010; and March 14 and 28, and May 18, 2011.  All records indicated that Plaintiff told Dr. Matuk that she had stopped using alcohol and cigarettes on October 12, 2009.  In all examination notes, Dr. Matuk's handwriting is illegible.

On November 17, 2009, radiologist Lorraine Ash, D.O., reviewed x-rays of Plaintiff's cervical spine, taken to evaluate Plaintiff's neck pain, radiculopathy, and limited range of motion. Dr. Ash identified (1) mild straightening of the normal lordotic curvature of the cervical spine. which might have partially resulted from patient positioning or an underlying muscle spasm; (2) mild levoconvex curvature of the cervical spine; (3) minimal loss of disc space height and anterior

///

osteophyte formation at the C-45 through C6-7 levels; and (4) mild foraminal narrowing at the C3-4 level secondary to uncovertebral hypertrophy.

On December 4, 2009, neurologist Katayoun Sebetian, M.D., performed EMG studies of Plaintiff's bilateral upper limbs. Dr. Sebetian diagnosed bilateral carpal tunnel syndrome, which was moderate to severe on the right and moderate on the left. EMG results of ulnar motor and sensory latencies of the upper limbs and cervical paraspinal muscles were normal.

On February 4, 2010, Dr. Matuk completed a "Short Form Evaluation for Mental Disorders." Although Dr. Matuk's handwriting is nearly illegible, she appears to have reported Plaintiff's physical diagnoses, including carpal tunnel syndrome. Dr. Matuk commented, "Patient unable to work—unable to lift or carry the children in her care—[remainder illegible]" AR 264. Plaintiff displayed anxious mood and appropriate affect. Her thought process was normal. Additional comments, including those relating to illicit drug and alcohol use, are illegible. Dr. Matuck checked boxes indicating that Plaintiff had no significant limitations in understanding, remembering, and carrying out complex or simple instructions; in maintaining concentration, attention, and persistence; in performing activities within a schedule and maintaining attendance; in completing a normal workday and workweek without interruptions from psychologically based symptoms; and in responding appropriately to changes in the work setting.

Plaintiff first saw hand surgeon and orthopedist Albert R. Swafford, M.D., on January 5, 2010. After diagnosing Plaintiff with bilateral carpal tunnel syndrome, Dr. Swafford prescribed medication and use of braces at night.

On February 9, 2010, Dr. Swafford reported that as a result of her carpal tunnel syndrome, Plaintiff was experiencing pain rated 5 out of 10. Although tingling continued during the day, bracing at night had produced relief and allowed Plaintiff to sleep. Vicodin relieved Plaintiff's pain.

On March 15, 2010, agency physician, K. Loomis, M.D., completed the psychiatric review technique. Dr. Loomis determined that Plaintiff had an anxiety-related disorder, which was not severe. As a result, Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.

On May 29, 2010, internist Emanuel Dozier conducted a consultative examination for the agency.  Plaintiff reported a fifteen-year history of bilateral carpal tunnel syndrome, with numbness, tingling, weakness, clumsiness, and pain (rated 8/10) in both hands and wrists, radiating to the elbows.  She also reported a fifteen-year history of neck pain, diagnosed as arthritis and cervical disc disease.  Pain (rated 10/10), originated in her neck and radiated to her shoulders and mid back.  Plaintiff told Dr. Dozier that she lived with her husband and daughter, cooking, cleaning, and babysitting.  Her prescriptions were Xanax, Oxycontin, and Diovan.

Following an examination, Dr. Dozier diagnosed cervical arthritis by history and bilateral carpal tunnel syndrome with positive Tinel's and Phalen's signs in the wrists.  He opined that Plaintiff could walk, stand, or sit six hours in an eight-hour day; lift twenty pounds occasionally and ten pounds frequently; occasionally crawl and climb; and occasionally reach, handle, feel, and finger.  The doctor attributed all restrictions to the wrist findings.  He recommended no environmental limitations.

On June 14, 2010, C. De la Rosa, M.D., prepared the agency's physical residual functional capacity assessment.  Dr. De la Rosa opined that Plaintiff could occasionally lift 50 pounds, and frequently lift 25 pounds; stand, walk, or sit six hours in an eight-hour day; frequently climb ramps, and stairs, balance, stoop, kneel, crouch, or crawl; occasionally climb ladders, ropes, or scaffolds; occasionally push or pull with her upper extremities; and occasionally move her head.  Handling (gross manipulation) and fingering (fine manipulation) were limited.

Cervical spine x-rays taken July 12, 2010, revealed degenerative changes of the uncovertebral joints and high-grade foraminal stenosis at C3-4 and C4-5; small extrusion of disc material at C7-T1; disc bulging with no extrusion at C5-6 and C6-7; and a reversal of cervical lordosis.

On November 29, 2010, R. Paxton, M.D., completed the psychiatric review technique.  Dr. Paxton found Plaintiff's psychiatric impairment (depression) to be not severe, noting insufficient evidence.  Dr. Paxton found no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  In concluding that Plaintiff's depression was not severe, Dr.

Paxton noted that Plaintiff received medication to which she responded well and had no mental health referrals or hospitalizations.

On December 29, 2010, agency consultant J. Frankel, M.D., opined that Plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; to sit, stand, or walk six hours in an eight-hour day; to frequently climb ramps and stairs, balance, and stoop; and to occasionally climb ladders, ropes, or scaffolds, kneel, crouch, or crawl. She had unlimited ability to push and pull. She should avoid concentrated exposure to cold or hazards.

X-rays of Plaintiff's lumbosacral spine, taken March 18, 2011, revealed mild degenerative changes, particularly between L3 and S1; early evidence of disc degeneration at L5-S1; and mild foraminal stenosis at L5-S1. Shoulder x-rays revealed bursitis and mild tendinosis.

Dr. Matuk completed a physical residual functional capacity questionnaire on August 31, 2011. Describing Plaintiff's prognosis as guarded, Dr. Matuk diagnosed severe degenerative and traumatic arthritis of the cervical spine, thoracic spine, and lumbar spine; bilateral carpal tunnel syndrome; bilateral shoulder and knee pain; severe depression and anxiety; severe insomnia; recurrent vertigo with multiple falls; and recurrent migraine headaches. Plaintiff experienced pain throughout her entire musculo-skeletal area, worsened by physical activity. Reactive depression and chronic anxiety aggravated Plaintiff's pain syndrome and caused her insomnia. She constantly experienced pain severe enough to interfere with the attention and concentration needed to perform even simple work and was incapable of even low stress jobs.

In Dr. Matuk's opinion, Plaintiff could not walk one city block without rest or severe pain. She could sit or stand for no more than 15 minutes at a time, and for no more than two hours in an eight-hour workday. Plaintiff needed to elevate her legs when she sat. She could never lift more than ten pounds and rarely lift less. She should rarely look up, down, left, right, or up, or hold her head in a static position. She should never twist, stoop, bend, crouch, squat, or climb ladders or stairs. In five places on the questionnaire, Dr. Matuk opined that Plaintiff was "totally and permanently disabled."

On September 2, 2011, Plaintiff's medications included Promethazine (allergies), Viibryd (depression), Hydrocodone with APAP (pain), Losartan (blood pressure), Estradiol (menopause),

Tramadol (pain), and Alprazolam (anxiety).  Side effects included dizziness, nausea, sleepiness, lack of concentration, and memory loss.

**Dr. Gurvey's testimony.**  The impartial medical expert, Dr. Gurvey, identified five diagnostic areas applicable to Plaintiff: (1) a history of bilateral carpal tunnel syndrome; (2) a history of mild degenerative disc disease of the cervical spine; (3) a history of mild degenerative disc disease of the lumbosacral spine; (4) status post hysterectomy; and (5) obesity.  None of these diagnoses met or equaled any listing.  He opined regarding Plaintiff's residual functional capacity:

> I would put her in a medium category of lift and carry, occasionally 50 pounds and frequently 25 pounds.  She could sit, stand, and walk six out of eight hours with the usual breaks.  She would need no push/pull restrictions with the 50 and 25 range.  Posturally, she should occasionally climb ladders, scaffolds, and ropes because of weight.  Manipulatively, she should avoid a chronic flexed wrist position and only occasional fingering such as keyboarding for more than 30 minutes at a time without a five minute break.  There would be no audiovisual, communicative, or environmental restrictions.

AR 100.

Dr. Gurvey rejected the residual functional capacity opinion provided by Plaintiff's treating physician, Dr. Aileen Matuk, M.D., as unsubstantiated by objective medical evidence.  He noted that the neck and lumbosacral spine problems were "minimal."  Also, nothing in the record supported Dr. Matuk's opinion that Plaintiff could sit, stand and walk for less than two hours in eight, and only rarely lift ten pounds.  Nor did medical evidence support a conclusion that Plaintiff's carpal tunnel syndrome was severe or that Plaintiff had significant postural limitations.  In response to Plaintiff's single question on cross-examination, Dr. Gurvey acknowledged that he had not examined Plaintiff.

**Vocational expert testimony.**  Kenneth Ferra testified as vocational expert.  He classified Plaintiff's babysitting work as child monitor (medium, semi-skilled, SVP 3).

For the first hypothetical question,[1] the ALJ directed Mr. Ferra to assume a hypothetical individual who could lift or carry 25 pounds frequently, 50 pounds occasionally; stand, walk, or sit

---

[1] The ALJ, Mr. Ferra, and Plaintiff's attorney later redesignated the numbering of the hypothetical questions as one through five, to reflect the additional conditions added after hypothetical two, but not designated by number.  *See* AR 119-AR 120.

six hours in an eight-hour workday; and occasionally climb ladders.  She could not hold her wrists at

a chronically fixed position.  The individual could not work at a keyboard for more than 30 minutes

without taking five minutes of rest.  Mr. Ferra opined that such an individual could perform

Plaintiff's prior work as a child monitor.

For the second hypothetical question, the ALJ directed Mr. Ferra to assume a hypothetical

individual who could lift or carry ten pounds frequently or twenty pounds occasionally; could stand,

walk, or sit six hours in an eight-hour work day; and could occasionally climb or crawl.  Her use of

her bilateral upper extremities was limited to occasional reaching, occasional gross, occasional fine,

and occasional feeling activities.  Mr. Ferra opined that such a person could not perform Plaintiff

prior work as a baby monitor.

The ALJ next directed Mr. Ferra to assume a hypothetical person with a GED, the same past

work experience as Plaintiff, and the limitations set forth in the second hypothetical.  Because of the

manipulative limitations, said Mr. Ferra, only three categories of occupations would be available to

the hypothetical person.  At the light, unskilled level, she could work as a counter clerk (No.

241.366-010), with approximately 2300 positions in California, or as a furniture rental clerk (No.

295.357-018, approximately 2100 positions in California.  At the sedentary level, the hypothetical

individual could work as a call out operator (No. 237.367-014) with about 1200 positions in

California.  For each of the designated positions, approximately ten times as many positions are

available nationwide.

For the third hypothetical question, the ALJ directed Mr. Ferra to assume a hypothetical

individual who could occasionally lift or carry up to nine pounds; stand or walk less than two hours

in an eight-hour work day; sit less than two hours in an eight-hour work day; stand or walk no more

than 15 minutes continuously; never twist, stoop, crouch, or climb; and can only occasionally look

down, turn head left or right, look up, or hold head in a static position.  Mr. Ferra confirmed the

///

ALJ's assumption that such a person could not perform Plaintiff's prior work as a child monitor nor could she perform any other full-time position in the national economy.

For the fourth hypothetical question, the ALJ directed Mr. Ferra to assume a hypothetical individual who could lift or carry 50 pounds occasionally, 25 pounds frequently; stand, walk, or sit six hours in an eight-hour work day; only occasionally push or pull with her bilateral upper extremities; occasionally climb ladders; frequently climb stairs; frequently balance, stoop, crawl, crouch and kneel; and occasionally move her head.  Bilateral repetitive handling and fingering activity was limited.  Mr. Ferra opined that such a person could perform Plaintiff's prior work as a child monitor.

Plaintiff's attorney, Ms. Lopez, asked Mr. Ferra whether the hypothetical person could perform any of the positions that he identified in the prior hypotheticals, if the hypothetical person also had a moderate impairment of her concentration, persistence, and pace that would result in her being off task up to one-third of the day.  Mr. Ferra opined that no jobs would be available for such an individual.

Ms. Lopez then asked Mr. Ferra whether the hypothetical person could perform any of the positions that he identified in the prior hypotheticals if she was incapable of performing even a low stress job.  Mr. Ferra interpreted a low-stress job as one requiring less than eight hours daily and opined that no jobs would be available for such a hypothetical person.

For the eighth hypothetical, Ms. Lopez directed Mr. Ferra to assume an individual who could sit, stand, or walk only four hours in an eight-hour day and only occasionally finger, handle, or perform gross or fine motor activity.  Mr. Ferra opined that no jobs would exist for such a person.

## II.    Discussion

### A.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment

which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such

severity that he or she is not only unable to do his or her previous work, but cannot, considering age,

education, and work experience, engage in any other substantial gainful work existing in the national

economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations

prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§

404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged

onset date of October 27, 2009.  Her severe impairments were bilateral carpal tunnel syndrome,

degenerative joint disease of the right shoulder, degenerative disc disease, hypertension, headaches,

and obesity.  None of these impairments or in any combination met or medically equaled the severity

of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (20 C.F.R. §§ 404.1520(d),

404.1525, 404.1526, 416.920(d), 416.925, 416.926).  Plaintiff was capable of performing medium

work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), with the following modifications:

stand, walk, or sit six hours of an eight-hour workday; occasionally climb ladders; cannot hold wrists

in chronically flexed position bilaterally; and cannot perform keyboarding activities bilaterally for longer than 30 minutes after which she must rest for five minutes before returning to keyboarding activities.  Plaintiff was capable of performing her prior work as a babysitter.  Accordingly, Plaintiff was not disabled, as defined by the Social Security Act.

## B.   <u>Scope of Review</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

## C.   <u>Physicians' Opinions</u>

Plaintiff challenges the ALJ's analysis of the medical evidence in the record, contending that he erred in rejecting Dr. Matuk's opinion that Plaintiff was totally and permanently disabled in favor of the opinions of the examining and non-examining physicians.  The Commissioner replies that the ALJ did not err in relying on the opinions of Dr. Gurvey and Dr. De la Rosa, both of which were

consistent with the objective evidence of record and the conservative treatment provided to Plaintiff, and in rejecting Dr. Matuk's extreme opinion, which was not consistent with the objective evidence.

**Plaintiff's credibility.** Before considering medical opinion, the Court finds it relevant to consider Plaintiff's credibility, an important factor in evaluating her claims. The ALJ found that although Plaintiff's reported symptoms were consistent with objective medical evidence, her reports of the intensity, persistence, and limiting effects of her symptoms were not fully credible. An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported

13

by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

In this case, the ALJ noted Plaintiff's poor work history and contradictions in her claims to the agency and her representations to Dr. Matuk and other physicians.  For example, Plaintiff told Dr. Matuk that she had no difficulties with her medications but testified to multiple and serious side effects during the agency hearings.  The ALJ also contrasted Plaintiff's claimed impairments with her telling Dr. Dozier that she continued to babysit children in her home, a physically and emotionally demanding activity.

This Court agrees with the ALJ's assessment of Plaintiff's credibility.  It notes that Dr. Matuk's February 4, 2010 psychological evaluation also reflects continued babysitting activity.  The Court also considers as evidence of Plaintiff's lack of credibility in her repeated claims that she had suffered from carpal tunnel syndrome and severe neck and back pain for fifteen years, a time period in which she, at various times, completed her GED, simultaneously babysat three pre-school-aged children, and cared for her bedridden mother.  Despite her claims of long-term disability, she did not consult a physician until she saw Dr. Matuk on October 27, 2009, just before she applied for disability benefits.

Inconsistencies between Plaintiff's claims and testimony, and her written adult function report also support the ALJ's finding that Plaintiff lacked credibility.  In January 2010, for example, well after she had asserted disability, Plaintiff wrote that she was driving her daughter to work daily, cooking dinner, loading laundry, sweeping, mopping, and doing other house cleaning.  She liked to sew and did the mending.  Plaintiff went out four or five times weekly, driving herself in her car, and shopped two to three times a week for an hour or two.  She could walk two hours before needing ten or fifteen minutes rest. Her principle difficulty was performing manual tasks, such as chopping vegetables or mixing, as a result of her carpal tunnel syndrome.  Then suddenly, after the agency

denied her application for disability benefits in June 2010, Plaintiff reported having become nearly bedridden and in intractable pain.  She testified that she had not driven a car since November 2009.

The record is replete with inconsistencies.  Plaintiff told Dr. Matuk that she had stopped using cigarettes and alcohol in early October 2009, but in January 2010, she told the agency that she became anxious and angry when she could not have a cigarette or a drink.  She testified that she stopped babysitting in 2006, when her relatives' children became too old to need care, but, in May 2010, Plaintiff told Dr. Dozier that she was then babysitting children in her home.  And Plaintiff was completely unable to explain the periodic gaps in her employment history.

In short, the record supports the ALJ's conclusion that Plaintiff lacked credibility.  Because of Plaintiff's lack of credibility, every medical opinion presented must be evaluated in light of its dependence on Plaintiff's self-serving representations.  The ALJ properly did so, limiting his reliance on opinions based on Plaintiff's subjective representations of her physical condition.

**Expert medical opinions.**  Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "An ALJ is not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S.S.R. 96-5p.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nontreating physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is

employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of the medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject an *uncontradicted* opinion of a treating or examining physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings, the ALJ may resolve the conflict.

An ALJ must determine a claimant's residual functional capacity based on "all relevant evidence in the record."  *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The ALJ must tie the objective factors of the record as a whole to the opinions and findings that he or she rejects.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Plaintiff contends that the ALJ erred by favoring the opinions of non-examining physicians, Drs. Gurvey and De la Rosa, over that of Dr. Matuk, who was retained as Plaintiff's primary care physician about 45 days before Plaintiff applied for disability insurance benefits.  At AR 17- AR 20,

16

the ALJ carefully analyzed the various expert opinions regarding Plaintiff's residual functional capacity, including those of Dr. Matuk; of the consultative physician, Dr. Dozier; and of the non-examining physicians, Drs. Gurvey and De la Rosa, as well as the treatment records of Dr. Matuk and the specialists to whom she referred Plaintiff, particularly for evaluation of her carpal tunnel syndrome.  He explained in detail his preference for the opinion of the independent consultant, Dr. Gurvey, whose testimony contemplated Plaintiff's various diagnoses, the objective medical evidence, and her conservative treatment regime.  He emphasized the persuasive value of his being able to question Dr. Gurvey and of Dr. Gurvey's ability to hear Plaintiff's testimony and to question her thereafter.

The ALJ limited the weight he gave to Dr. Dozier's opinion since it rested primarily on Plaintiff's own unreliable account of her medical history.  Similarly, he rejected portions of Dr. De la Rosa's opinion since objective medical evidence did not support his limitations on head movements, and since De la Rosa's opinion on pushing, pulling, handling, and fingering was not sufficiently specific.

The ALJ found Dr. Matuk's opinion unpersuasive for two reasons.  First, her diagnosis of severe degenerative disc disease was not supported by the mild findings of the diagnostic testing.  Second, her opinion rested on an incorrect assumption that Plaintiff had already undergone carpal tunnel surgery.

This Court agrees with the ALJ's analysis.  Substantial evidence supported his determination to favor Dr. Gurvey's opinion and to reject Dr. Matuk's opinion.  In his testimony, Dr. Gurvey carefully explained his opinion on Plaintiff's residual functional capacity in light of the medical evidence in the administrative record, and explained why Dr. Matuk's opinion was inconsistent with her diagnosis and treatment of Plaintiff.   Dr. Gurvey's testimony was a thoughtful and detailed narrative in contrast to the check-off form prepared by Dr. Matuk.  Plaintiff's attorney cross-examined Dr. Gurvey only to emphasize that he had not examined Plaintiff.

In contrast, Dr. Matuk's completion of an attorney-generated check-off form was careless and extreme.  As the ALJ noted, Dr. Matuk erred in her recollection of Plaintiff's test results and prior diagnoses.  To the extent that they could be deciphered, Dr. Matuk's treatment notes revealed her reliance of Plaintiff's subjective representation of her condition rather than objective measures.

Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

Since his analysis and conclusion were well articulated and supported by substantial evidence in the record, the ALJ did not err in his assessment of the relative credibility of Plaintiff and the various medical experts, nor in his decision to favor the opinion of the independent medical consultant, Dr. Gurvey, over that of Dr. Matuk.

**III.    Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   __**May 28, 2014**__                          _____**/s/ Sandra M. Snyder**
                                                          UNITED STATES MAGISTRATE JUDGE